IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JOSEPH D. HERMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) ase No. 10–cv–564–MJR–SCW |
| | ) |
| NORMAN DODSON, | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM AND ORDER

REAGAN, District Judge:

I. Introduction

Pursuant to Federal Rule of Civil Procedure 56, Defendant Norman Dodson moves for summary judgment on Plaintiff Joseph Herman's deliberate indifference claim, asserting that (1) Herman cannot show that he was deliberately indifferent to Herman's serious medical needs; and (2) he is entitled to protection under the qualified immunity doctrine (Docs. 30 & 31). Herman filed a Response to Dodson's motion (Docs. 32 & 33). For the following reasons, the Court **DENIES** Dodson's motion for summary judgment.

II. Factual Background

This action stems from an incident which occurred on March 22, 2010, while Herman was housed at Tamms Correctional Center. On that date, Herman allegedly informed Dodson, who was working as a housing unit control officer at the time of the incident, that he was going to injure or cut himself

(Doc. 31 at pp. 1-2; Doc. 31, Ex. B at p. 20).  As the control officer, Dodson could not leave his post or see into the cells (Doc. 31, Ex. B at pp. 24-25, 37; Ex. D at p. 40).  The parties agree that the proper procedure for a control officer when informed that an inmate plans to self-harm is to contact his zone lieutenant (Doc. 31, Ex. D at pp. 39-40).  The parties dispute whether Dodson contacted his supervisor, Lieutenant Benefield, directly after Herman informed him of his intent to self-harm.  Herman claims that Dodson completely ignored his statements about his intent to harm himself.  Dodson contends that he contacted his supervisor about Herman's threats, in accordance with protocol. The record shows that this is a matter that is the subject of considerable contradictory evidence.

What is agreed upon is that at 11:30 a.m., C/O Dowdy informed Benefield that Herman had a cut down the outside of his lower right leg (Doc. 32, Ex. C-1). Benefield went to Herman's cell and observed that the cut was approximately seven inches long and a half inch wide. *Id.*  Jeffrey Peterson, a wing officer at Tamms, testified that in all likelihood he discovered Herman's injury on a regular wing check (performed at 30-minute intervals), given the time noted in the general log (Doc. 32, Ex. D at pp. 8-9).  Benefield does not recall whether anyone informed him of Herman's intent to self-harm prior to being approached by Dowdy.  However, Benefield indicated that if he had been informed of Herman's statements, he would have gone to Herman's cell immediately to discuss the situation with him, and he does not recall doing that

prior to speaking with Dowdy (Doc. 32, Ex. C at pp. 20-21, 31-32). Herman indicated that he had cut himself with a piece of glass from his eye glasses, which he destroyed because all of the noise on his wing kept him from sleeping (Doc. 32, Ex. C-1). Herman was ordered to cuff up and was taken to the nurses' station where he received 14 stitches. He was then returned to his cell on a 10-minute mental health watch or suicide watch (*Id.*; Doc. 32, Ex. D-1).

### III. Summary Judgment Standard

Under **FEDERAL RULE OF CIVIL PROCEDURE 56(c)**, summary judgment is proper only if the moving party can demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." ***Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).** *See also **Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005)**. The burden is upon the moving party to establish that no material facts are in genuine dispute; any doubt as to the existence of a genuine issue must be resolved against the moving party. ***Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970).** *See also **Lawrence v. Kenosha County*, 391 F.3d 837, 841 (7th Cir. 2004)**. A fact is material if it is outcome determinative under applicable law. ***Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)**; ***Ballance v. City of Springfield, Illinois Police Department*, 424 F.3d 614, 616 (7th Cir. 2005)**; ***Hottenroth v. Village of Slinger,* 388 F.3d 1015, 1027 (7th Cir. 2004).** Even if the facts are not in dispute, summary judgment is

inappropriate when the information before the court reveals that "alternate inferences can be drawn from the available evidence." ***Spiegla v. Hull***, 371 F.3d 928, 935 (7th Cir. 2004).  *See also **Anderer v. Jones***, 385 F.3d 1043, 1064 (7th Cir. 2004).

The threshold inquiry is whether a trial is needed, or, in other words, whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

> [T]his standard mirrors the standard for a directed verdict under FEDERAL RULE OF CIVIL PROCEDURE 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.

***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 250 (1986).  *See also **Celotex Corporation v. Catrett***, 477 U.S. 317, 322-23 (1986); ***Packman v. Chicago Tribune Co.***, 267 F.3d 628, 637 (7th Cir. 2001); ***Sybron Transition Corporation v. Security Insurance Company of Hartford***, 107 F.3d 1250, 1255 (7th Cir. 1997).

A showing of a mere factual disagreement between the parties is insufficient; the factual issue must be "material," meaning that the issue must be one affecting the outcome of the suit.  *See **Outlaw v. Newkirk***, 259 F.3d 833, 837 (7th Cir. 2001). A moving party is entitled to judgment as a matter of law where the nonmoving party "has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of

proof." *Celotex*, 477 U.S. at 323. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.*

## IV. Analysis

### A. Deliberate Indifference

The Supreme Court has declared that a prison official's "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "The infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense." *Duckworth v. Franzen*, 780 F.2d 645, 652-53 (7th Cir. 1985). Negligence, gross negligence, or even "recklessness" as that term is used in tort cases, is not enough. *Id.* at 653; *Shockley v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987). Put another way, the plaintiff must demonstrate that the officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the officials actually drew that inference. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence,… and a fact finder may conclude that a prison official knew of a

substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (citations omitted). A plaintiff does not have to prove that his complaints of pain were "literally ignored," but only that "the defendants' responses to it were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008) (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)). The Seventh Circuit has noted that this standard is "a high hurdle … because it requires a 'showing as something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012) (quoting *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006)). "Even if the defendant recognizes the substantial risk, he is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (quoting *Farmer*, 511 U.S. at 843).

In order to prevail on such a claim, a plaintiff must show that his condition was "objectively, sufficiently serious" and that the "prison officials acted with a sufficiently culpable state of mind." *Greeno,* 414 F.3d at 652-53 (citations and quotation marks omitted). Dodson does not contend that Herman's threats to injure himself do not constitute a sufficiently serious medical condition. Instead, Dodson argues that he did not act with a sufficiently culpable state of mind to meet the second prong of the deliberate

indifference standard.

The Court finds that genuine issues of material fact exist which prevent the Court from granting summary judgment at this time. Herman's Complaint alleges that Dodson was deliberately indifferent because he did nothing in response to Herman's request for help from the Mental Health Department and his statement that he was going to cut himself. Dodson claims that he contacted Benefield in accordance with protocol when Herman initially told him that he was going to injure himself. But other evidence in the record contradicts Dodson's version of events, including his own statements.

On the one hand, in response to Herman's April 5, 2010, grievance regarding the events at issue, Dodson indicated to the grievance counselor that he did not tell Benefield of Herman's intent to self-harm. Specifically, Dodson indicated that he was "sure Inmate Herman called me and cried again. And I more than likely told him to contact the floor C.O. when they make their rounds" (Doc. 32, Ex. A at p. 34; Ex. A-1). There is no indication that he contacted anyone about Herman's intent to harm himself. Furthermore, in Dodson's Answers to Interrogatories, he did not indicate that Herman even told him about his desire to cut himself. Rather, he stated that Herman requested to speak to mental health but yelled profanities at Dodson when he asked Herman what his concerns were (Doc. 32, Ex. A-2). Dodson's interrogatory answers indicate that he contacted Benefield but do not indicate that he told him about Herman's desire to cut himself (*Id.*).

On the other hand, at his deposition, Dodson stated that when Herman told him of his intent to cut himself, he contacted Benefield to inform him of Herman's intent, and Benefield sent correctional officers working the floor to check on Herman (Doc. 32, Ex. A at pp. 20, 23).

Dodson appears to rely on the latter version of events in his summary judgment motion, but this testimony contradicts his prior statements regarding the incident.  Clearly, there are disputes of fact as to what occurred during the conversation between Dodson and Herman and how Dodson responded to Herman's statements, disputes that are present in Dodson's own statements regarding the events.

Dodson's version of events is also contradicted by Herman's testimony and the testimony of the other officers on duty at the time of Herman's injuries.  Herman testified in his deposition that he contacted Dodson sometime before lunch (around 9:45 a.m. according to his grievance), by pressing the emergency call button.  According to Herman, at that time he told Dodson that he intended to cut himself and needed to speak with mental health (Doc. 32, Ex. B at pp. 16-21).  Herman testified that Dodson responded by telling him to go ahead and hurt himself (*Id*. at p. 20).  Herman admits that after Dodson's response, he cursed at Dodson (*Id.*).  Herman then started cutting himself with a sharpened ink pen and a piece of his broken eye glasses (*Id*. at pp. 22, 43).  Ten to fifteen minutes after his first contact with Dodson, Herman pushed the emergency call button and informed Dodson that he had

indeed cut himself and needed to see a nurse (*Id.* at pp. 23-24). According to Herman, Dodson responded that there was no blood on the gallery, and since he did not see any blood he was not calling it in (*Id.*). Dodson, however, denies that he made these statements to Herman (Doc. 32, Ex. A at pp. 42-43). Herman testified that Benefield was not called and that his injury was not discovered until a wing check was done sometime later by C/O Dowdy (Doc. 32, Ex. B at p. 30). Herman's testimony directly contradicts Dodson's testimony that he called Benefield immediately upon speaking with Herman and that officers were sent to check on Herman.

Evidence of other officers present at the time of Herman's self-harm also contradicts Dodson's testimony. Benefield did not recall if Dowdy was the first person to inform him of Herman's injury, but he did state that if he had been informed by an officer of an inmate's intent to self-harm, he would have immediately gone to the inmate's cell to talk to him. Benefield did not recall doing so with Herman prior to being approached by Dowdy (Doc. 32, Ex. C at pp. 20-21, 31-32). This testimony is consistent with Benefield's report on the incident (Doc. 32, Ex. C-1). Furthermore, Jeffrey Peterson, a wing officer present at the relevant time, testified that the time noted on the log for the discovery of Herman's injury, approximately 11:30, indicated that the injury was discovered during a regular wing check (Doc. 32, Ex. D at p. 8). This testimony contradicts Dodson's testimony that officers were sent to check on Herman after Dodson reported Herman's intent to the Lieutenant.

Given Dodson's own conflicting evidence, Herman's contradictory testimony and the seemingly contradictory evidence of other correctional officers, the Court finds that genuine issues of material fact exist, and summary judgment is not warranted. A jury could find that Dodson showed something approaching a total unconcern for Herman's welfare in the face of a serious risk, *Rosario*, **670 F.3d at 821,** and, as such, was deliberately indifferent to Herman's serious medical needs.

The Court turns to the question of whether summary judgment should be granted, nonetheless, based on a defense of qualified immunity.

**B.    Qualified Immunity**

Dodson contends that he is entitled to summary judgment under the doctrine of qualified immunity. To defeat a defense of qualified immunity, a plaintiff must show (1) the deprivation of a constitutional right and (2) that the right was clearly established at the time of the violation. ***Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002) (citing *Alvarado v. Litscher*, 267 F.3d 648, 652 (7th Cir. 2001)).** A court may, in its sound discretion, decide which of these two prongs to address first. ***Stainback v. Dixon*, 569 F.3d 767, 770 (7th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)).** Moreover, "[u]nder certain circumstances,… the two inquiries effectively collapse into one." ***Walker v. Benjamin,* 293 F.3d 1030, 1037 (7th Cir. 2002) (citation omitted)**. Specifically where, as here, there are genuine issues of fact concerning the elements of deliberate indifference,

"a defendant may not avoid trial on the grounds of qualified immunity." ***Id.***

The Court has already discussed at length the issue of whether Dodson's conduct constituted a violation of Herman's constitutional rights and has concluded that this issue is a question of fact for the jury. ***See Lewis v Downey*, 581 F.3d 467, 478 (7th Cir. 2009).** Consequently, Dodson is not entitled to qualified immunity. ***Walker*, 293 F.3d at 1037.**

Moreover, even if the Court were to consider the second prong of the qualified immunity analysis, "[t]he general standard for liability under the Eighth Amendment for refusal to treat a serious medical condition was well-established at the time of [Herman's injury]." ***Id.* At 1040**. Accordingly, the Court finds that Dodson is not entitled to summary judgment based on qualified immunity.

## V. Conclusion

For the above-stated reasons, the Court **DENIES** Defendant Dodson's motion for summary judgment.

IT IS SO ORDERED.

DATED this 11th day of June, 2012

    s/Michael J. Reagan
    MICHAEL J. REAGAN
    United States District Judge